The next case called Oral Argument is Item 3, the Marriage of Smith. Everybody ready? Whoever the appellant is talking to. Okay. I didn't read that part. This is an appeal from a judgment of dissolution of marriage entered on March 15, 2010. Previously, Ms. Reynolds and Mr. Smith, without counsel, obtained a judgment of dissolution of marriage on September 29, 2008. And that judgment awarded Ms. Reynolds full custody of their minor child and established a visitation schedule for Mr. Smith. In October of 2008, Mr. Smith filed a motion to vacate the September 2008 judgment. Ms. Reynolds then filed a petition for a leave to remove the child from the state and a petition to reopen the dissolution proceeding to divide the marital property, award child support, maintenance, and attorney's fees. On December 2, 2008, the trial court reopened the dissolution of marriage proceedings on all issues, except that the marriage remained dissolved and Ms. Reynolds retained her maiden name. That same order, the December 2, 2008 order, vacated the terms of the September judgment with respect to custody. The December 2008 order gave temporary custody of the minor child to Ms. Reynolds, established Mr. Smith's child support obligation, and set out Mr. Smith's visitation schedule. In January, approximately January of 2009, Mr. Smith filed a motion to reduce or suspend child support because he had become unemployed. In May of 2009, Ms. Reynolds filed a motion for contempt for non-payment of child support, and then in July of 2009, she filed a motion to increase child support as Mr. Smith had returned to full-time employment at his previous job. The March 15, 2010 order gave the parties joint legal custody of their minor child. It gave primary physical custody to Mr. Smith, and also gave him final decision-making authority, although ostensibly there was a joint parenting agreement. The trial court denied Ms. Reynolds' petition to remove the child from the state, denied maintenance as to both parties, awarded Ms. Reynolds $2,000 in attorney fees, established a visitation schedule for Ms. Reynolds, and set out an amount of Mr. Smith's child support arrearage payment. Ms. Reynolds is appealing the custody award, the award of attorney fees, the visitation schedule, and the amount of Mr. Smith's child support arrearages. There were presented eight issues on appeal. The first issue addresses the award of primary physical custody. That issue is the trial court erred by awarding primary physical custody of the minor to Mr. Smith. Actually, for all eight issues on appeal, the standard of review is whether it's an abuse of discretion or against the manifest weight of the evidence. Ms. Reynolds, her position is that the award of primary physical custody to Mr. Smith was an abuse of discretion and against the manifest weight of the evidence. She had been primary caretaker of the child since his birth. He's now about five years old. There's some precedent for this in remarriage of Bush. In that case, the mother was given custody because she had been the caretaker of the child since birth. The trial court, in its order, has some language addressing the stability that Ms. Reynolds could provide for the child. However, there's legal authority that stability only controls when there's an adverse influence on the child. There's no presumption that stability or lack thereof has an adverse influence on the child. Two of those cases are the Nolte case and then in remarriage of Thompson, the Illinois Supreme Court case. At trial, there was testimony and the trial court noted in its order that she, Ms. Reynolds, had three residences. And, as this was, she was still living with her significant other. However, there was also testimony that Mr. Smith, after they separated, he did not provide any child support or maintenance to try to support Ms. Reynolds or the child. And she, after they separated, she started having a relationship with her significant other, but they were not living together. After they were divorced in September 2008, because of financial reasons, she moved to Missouri to live with her parents. However, Mr. Smith then filed a motion against the removal. Once she got that, she immediately returned to Illinois. However, she was receiving no support from Mr. Smith. She moved in with her significant other. They are still together. They were together at the time of trial. They moved out of the apartment into a bigger house with three bedrooms, enough space for the child. And then they were trying to improve the environment for the child. It looks like the kind of case where the issue of custody was a close call. Do you agree with that? Well, the GAL more or less said either of them. The GAL did not provide a definitive recommendation. Right. And the child judge, if I remember right, made a finding that they were both capable of caring for the child and so forth, isn't that correct? Yes, the child court, even though she talked about Ms. Reynolds' disability, she said that they were both capable of providing a nurturing relationship for the child, which is a bit contradictory. Well, if the standard is manifest way to the evidence, the case law says that in order to reverse based on manifest way to the evidence, we have to find that the trial judge's decision, the opposite conclusion was plainly apparent, or words to that effect. How is it that it's apparent that this decision is wrong? One, that Ms. Reynolds had been the primary caretaker of the child when she and Mr. Smith were married. He worked a similar shift work as he was working during their separation at the time of trial, rotating shift work. She had sole care of the child based upon the legal authority push that she had been the primary caretaker. Two, that there's a case we saw approved that the court can consider the failure to pay child support. Here, that is the case. I mean, he did start paying child support in December 2008 after he was ordered by the court. But at that time, he didn't voluntarily make any attempts to support his child. And then even after the court ordered child support, he became, he amassed an arrearage. He testified at trial that he didn't think he should have to pay child support, even though he had had a motion to reduce. That was granted. He had a downward deviation from the statutory guideline. He was only paying 17 instead of 20%. I'm taking those into consideration that that case law, I think it's clear that this was against the man's best way to be evident, that Ms. Reynolds could provide the more stable relationship. In fact, the GAO noted that if Mr. Smith continued to work those hours, that she thinks the stability would lean towards, then with Ms. Reynolds. So, I do think it is against the man's best way to be evident. And there was trial testimony by his own relative to support that. His mother said because he worked, he ratted shift work, that she would be babysitting quite often. But yet she had seven people living in her house. You know, people in and out. Second, the very fact that he worked shift work. And there was testimony by his relative that the child would be awake after 11 p.m. in the evening or have to be up by 5 o'clock in the morning. That's not providing a stable environment for the child. Also, in the winter of 2009 to 2010, he didn't repair a furnace. He was fully employed. And so when he had the child for visitation, the child was living in a house that didn't have heat for several months. The second issue on appeal is the trial court error by awarding joint legal custody. To the parties, but giving Mr. Smith final decision-making authority. The trial court found that both parties could cooperate fully and consistently. There was really no evidence at trial to the contrary. Mr. Smith had testified that Ms. Reynolds was fully compliant with working with him with visitation schedules. And so then to give joint legal custody, but yet give him final decision-making authority is tantamount to sole custody. And in the brief, in Ms. Reynolds' brief, there's a citation to the Sightseer case where the trial court reversed the trial court. The trial court had given split decision-making authority to the parties. The trial court reversed that, saying that goes against what joint legal custody means. It's joint parenting and making decisions jointly. Mr. Smith, in his brief, cites to the Duffy case. That is not on point. That concerns whether in a joint parenting agreement, mediation provision should be mandatory rather than discretionary. Here, the joint parenting agreement has the mediation provision. So the added provision in there that Mr. Smith has final decision-making authority is surplus. It's unnecessary, and there's no evidence in the record to support that. Actually says he gets the final word. Final word. What does that mean? I attribute that to me if they discuss something and there's a disagreement that he makes the final decision. Can a person get the final word but not have decision-making authority? That was helpful. In the spirit of the joint parenting agreement, I- It's actually not a joint parenting agreement either. It's a joint parenting order because there's no agreement. Yes, joint parenting order. I interpret that to mean that he has final decision-making authority. The third issue on the appeal is the standard that was applied. The trial court applied the best interest standard. This argument is that that should have applied the serious endangerment standard. In September 2008, there was a judgment of dissolution of marriage in that order. Mr. Reynolds was given sole custody, and there was a visitation, I think, on Tuesdays and Thursdays for Mr. Smith. He entered an appearance. The order, on the order of judgment of dissolution of marriage, it indicates that he entered an appearance and consented to a hearing. It does not indicate that he was defaulted. The position is that vacating that order was an abuse of discretion. Wasn't that an agreed order when it was vacated? The order was agreed and by order of courts implying that some parts of it may have been agreed to and some may have been by court order and not by agreement. Both parties filed motions to vacate at least portions of the original judgment of dissolution of marriage. Ms. Reynolds filed a petition to reopen that with respect to child support, maintenance, and the division of property, only not to custody. After both of those were filed, though, a court order was entered. That's correct. That was done by agreement, was it not? The order reads by agreement and by order of the court. So that's open to interpretation whether everything was by agreement because Ms. Reynolds filed a response to the motion to vacate and denied the allegations of the motion to vacate. But it's not specified in there that she disagrees with it being vacated as custody. In the December 2008 order? In the order that vacated the original judgment. It says by agreement and by court order everything is vacated except for the part that they're divorced. Yes, it does. Okay. So to follow that, if it was an abuse of discretion to vacate the September 2008, the dissolution of marriage, then the custody was in custody modification less than two years and the serious endangerment standards should have been applied. Thank you, counsel. Pardon? I think your time is up. Oh, okay. Thank you. Thank you, counsel.  Justices, Ms. Hawkins, may it please the court, my name is Jim Graves and I'm a member of the CFO League. Mr. Smith in this case, I think, Justice, you kind of got to the heart of the matter early on in your question of opposing counsel. And I think a couple of quick facts kind of lend this thing to the interpretation that you were getting to. These parties entered into filing pro se judgment of dissolution of marriage and pro se petition for dissolution of marriage. It was all prepared by Ms. Reynolds. It was brought to Mr. Smith. Mr. Smith signed it. It was brought to the court and the court signed it. Whether they read it in full or not, I don't know, but it left many things out. It left things like child support out, property distribution out. It left a whole litany of areas out. That was all done by Ms. Smith. Mr. Smith wasn't even president of the court the day that was entered. Shortly after that was entered, Ms. Smith decided to take the child and use that document to move to the state of Missouri across state lines. That's what got Mr. Smith involved in this case in the first place. So then he immediately filed a motion to vacate. It was followed up by his counsel's amended motion to vacate. Then when Ms. Reynolds got her counsel to vacate, they filed a motion to reopen. In December, the court got, for the first time, all the parties together speaking about the various issues. At that point in time, without a hearing, an order was entered by a grievance vacating every part of that court order with the exception of the fact that part of the course and Ms. Reynolds was granted her maiden name. Therefore, they were all back at square one as of December 2nd, 2008. In fact, child support was ordered by my client on that particular day, false. The court went that way until the hearing was held in March of 2010, at which time the court held that after a hearing, a full hearing, that my client, Mr. Smith, should have primary custody of this child subject to Ms. Miss Reynolds' visitation. The question for the court was whether or not she addressed all the various issues that she's required to address under Section 602. She specifically goes through those issues in her court order. She not only says, I considered them all, she specifically identified those. And some of those issues that the court found really interesting was the fact that Ms. Reynolds has no particular plan for her life. She had lived with one guy, with a guy and his friend, and their kids from time to time. She'd moved down to Missouri. She'd moved back with yet another guy, who she was living with at that particular point in time, and had no particular plan on how she was going to handle anything with regard to this child. Mr. Smith had the exact same house they were living in at the time they were married, exact same job, exact same time with this child. He'd done everything exactly the same. And what the court said, which I thought was interesting, was that while Ms. Reynolds had no ready plan for this child, Mr. Smith had a very stable plan. The GAO said the exact same thing. The GAO did a report. She said an award of custody to the father would bring more stability. She did then want to say if his shift changes came up, that would reduce some of that stability. But the issue of stability became a very important fact. I think the court addressed that without specifically identifying the time when the respondent's sister testified that the petitioner, Ms. Reynolds, actually took the child to another gentleman's home, spent the night there in the bed with that other gentleman, while she was still married to Mr. Smith. This court certainly addressed all those issues. There's absolutely no reason, and contrary to justice's opinion, I don't even think it was that close a call when it got down to it. I think there were several factors that did play into the decision. But those factors of stability, continuity of homeschooling, community, those things all clearly weighed in favor of the respondent. And I thought the court awarded it appropriately. With regard to the issue of joint custody of final say, I agree with Ms. Hawkins. I think when the final word is left with one party, that that party will ultimately make the final decision. I think it's the appellate's position that if you have such a thing, you can't have joint custody. I think the Duffy case, which I've had in my brain, says exactly the opposite. It says you must come up with a procedure for handling disputes, either mediation or otherwise resolved. The difference between what Ms. Hawkins says within the asylum custody case and the joint custody case is these parties must converse on major issues affecting the child. If they come to a problem with them, then Mr. Smith's going to make the final decision on it. But they're going to have this constant interaction with regard to these major decisions for the child. I believe the court felt that while there were disputes that they had, that they could communicate on those lines. When the court indicated that they could communicate, the court didn't say that they would always agree. Mr. Smith clearly didn't agree with Ms. Rouse taking the child flying to Missouri to her family's residence at the Lake of the Oaks. He didn't agree with her keeping the child. He didn't agree with where she was staying with the child. But the court felt that after all those things, that the parties could communicate on those issues. So I think with regard to the joint custody issue, I believe the court, again, addressed that issue appropriately. Ms. Hawkins argues that the court shouldn't have vacated the original judgment. I think the court did exactly the right thing. I think the attorneys, when they got into the case, said this is a mess. This is a monumental scrooge, and we've got to go back and get it all straightened out. They all agreed to enter the order of vacating virtually the entire order, and it was entered that way. Let me ask you the same question I asked your opposing counsel. I mean, was it an agreed order? It was clearly an agreed order, Your Honor. It was a handwritten order by one attorney. It is signed not only by the attorneys but by the parties themselves at the end of it. So there's clearly no dispute that it was agreed to. I was the attorney at that particular point in time. There's no dispute when you look through it. It wasn't a situation where the court held a hearing on this and said, after a hearing, this is the order I'm going to enter. No hearing was ever held on it. This is what the parties had reached, and it covered an olympia of things in addition to vacating any issues with regard to custody. So, therefore, the standard to be applied is the best interest standard. I think the court applied the best interest standard. I think under the Bergen case, which I cited in my brief, the Fifth District Bergen case, where the father acquiesced in a re-adjudication company, he can't now come back and question that same order. That's exactly what Ms. Wentz wants to do. She wants to acquiesce in it until it doesn't go her way, which she then wants to say you can't go back and re-adjudicate them. Ms. Parker has also argued on behalf of her clients in her brief that the visitation schedule wasn't appropriate because it didn't give her the exact same visitation that Mr. Smith got in the temporary order, the assembly order. Well, there's no citation of any authority in the statute or any case law, and I couldn't find it, that said that when you enter a final custody order and a final visitation order, you must afford the visiting party the exact same visitation they had before. The reason for that is certain facts come off the trial, which changes it. There was never any hearing held in this case until that hearing in March 2010, and therefore, I think the court addressed those issues based upon the information she had before. Before, she was in the best position to observe the demeanor of the witnesses, the testimony, and the evidence presented. Based upon that, she set forth the visitation schedule that she felt was appropriate, and it's a fairly substantial visitation schedule. One of the other issues which was raised, the fifth issue which was raised by the appellant, has indicated that the court didn't address the supporter areas. Well, that's not exactly accurate either because the facts are the things that arose, caused problems with regard to how the supporter areas were accounted for. Did the trial court say the arrearage is blank? No, the trial court said here's the arrearage. This is what you've got to pay back. I've ordered a number. You can pay it back. There's so much amount. Correct, so much amount. It didn't come up with a final amount. You're correct. It didn't order an arrearage. You can pay it back. So how long is your client supposed to pay this so much amount? Well, and I have calculated, Your Honor, that based upon my calculation, based upon what had already been paid, that he would have already, by the time we got here today, would have already paid off the arrearage that he still had. But the trial court never made a determination of what the total arrearage was. I agree with that. I agree with that. That's absolutely correct. Isn't that a problem? Well, I think it's a problem, Your Honor, but I don't think it's a problem from the standpoint of finding out how the calculations work because the support order was clearly established in December of 2008. The amount of support payments were clearly established. They were established by an exhibit offered by the appellate, and the payments were made in advance. I'm just focusing in on the arrearage. I mean, your client's under an order to pay X amount of dollars a month toward an arrearage in an unknown, unlimited amount. Correct. Now, the only place it ever comes up is the appellate filed their own, prepared and sent off their own notice for withholding, at which time they set forth the child support figure at $145 on the arrearage. This was before any court order ever established a payment on an arrearage. That was in September of 2009, a full seven months before the court heard this case in the first one. So I don't know how she can say she didn't address the arrearage issue. She might not have addressed the final number. Well, and doesn't that need to be done? I think that's an issue. And for your client's sake. I think it does need to be done, Your Honor, but I think that's a mathematical question rather than a question of pulling a number out of the air. This is simply a mathematical question. Well, I agree it's not a question of pulling a number out of the air. We don't want to do that. Right. But isn't it something that the trial judge still needs to do? It would probably be something that the trial judge would still need to do. But according to my calculation, Your Honor, based upon the orders that were already entered, he would have already paid off his support arrearage by this date. One of the other arguments that the appellant made was that there was an addressing of the petition to increase support. Well, as I set forth in my brief, there was no showing at the time of trial that the petitioner had increased needs for the child, or really at that point in time that the respondent had an increased ability to pay. But more importantly, I focused in my brief on the mandatory requirements, as set forth in the Davis case, the official Davis case, of showing that there's increased needs on behalf of the child. In fact, the petitioner didn't provide a current affidavit of absence of liability. At the time of trial, it relied on the affidavit that had been filed more than a year earlier. So there was no way that the court could address the issue of the modification of support  And if anything else, she addressed it by not giving my client support for the petitioner at the time she gave him primary custody. Finally, the appellant indicated that they did address the bonus issue. The important thing on the bonus issue, as I set forth in my brief, was that the bonus was granted in November of 2008. The agreed-upon child support order was entered in December of 2008. About a month after he got the bonus, and in January of 2009, he was immediately laid off. I think the bonus issue is, if anything, it's a red herring. It was available to the parties in court as of December of 2008, and he was laid off within the next month. So that issue was already addressed, according to my proposition, in the December of 2008 order. For all those reasons, Your Honor, and Justice, I believe the court order of the lower court should be affirmed at this point in time, and I thank you for your time. Thank you, counsel. I just want to take a moment to correct some of what Mr. Drazen calls facts about where Ms. Reynolds lived. After she and Mr. Smith separated, she was in an apartment in Granite City alone. She was not receiving any support. She had limited means. At that time, she was seeing her significant other, with whom she now lives, but they were not living together. Mr. Smith and Ms. Reynolds were divorced. She then moved home to Missouri. He filed a pro se motion opposing the removal. She moved back. She had no means, so she moved in with her significant other. They've been together all this time. She doesn't see other men. There was no testimony to that fact, and they're now living in a house, and they were at the time of trial. Again, the Nolte case and the Thompson case, that stability is a relevant factor, but unless there's a showing of an adverse effect on the child it's not controlling, there was no such showing here. As to the joint legal custody and the final word or the final decision-making authority, the Duffy case is not on point. Mr. Smith's argument is that, pursuant to the Illinois statute, that there has to be some kind of provision in case the parties cannot resolve a dispute. There is a required mediation provision in the joint parenting order. Thus, the court's order of joint legal custody, but Mr. Smith has the final word, final decision-making authority, is completely unnecessary and goes against what joint legal custody means under Illinois law. Tied up to the nebulous or uncertain amount of the arrearages is that Ms. Reynolds filed a motion to increase in July of 2009 because Mr. Smith returned to work. The cases that Mr. Smith relies on are in opposites. In those cases there was a child support order and then the custodial parent filed a motion to increase. Here we have the child support order. Mr. Smith filed a motion to reduce because he was unemployed and he was given a deviation from the statutory guideline. He had an attorney. He accepted that. Then when he returned to work, Ms. Reynolds filed a motion to increase. The increase of the child does not have any bearing in this situation. Moreover, there's the Garrett case which is cited in Ms. Reynolds' reply brief that the court does not have to address the needs of the child and either or it does not have to be one of the considerations. So Ms. Reynolds is asking that the court reverse the decision of the trial court and mandate to make a determination as to the arrearages, to rule on the motion to increase and to rule on the motion for contempt. There's not a clear finding in the March 15, 2010 order that there's testimony to support the contempt finding. He testified that he didn't think he had to pay child support. He had an attorney. He got a deviation. There was a hearing from that. He got a reduction. He just didn't think he had to pay it. He didn't disclose his bonus. He testified to that fact. So that shows a vocal and consummative refusal to comply with court orders. And then, as to the bonuses, Mr. Smith confuses it. The retroactivity that once Ms. Reynolds found out about the existence of a bonus, that was part of her motion for contempt filed in May. And the accolades case is on point. In that case, there was the alibis or failed to disclose bonuses and the custodial parent filed a petition for contempt. The court found in the contempt and awarded child support or rearages out of that bonus regardless of a retroactive date. Accordingly, Ms. Reynolds asked that the court reverse the custody award, reverse as to the joint legal custody, award custody to Ms. Reynolds and remand to the child support for determinations with respect to the motions that were not ruled on the motion to increase and the motion for contempt. Thank you. Thank you, counsel. We appreciate the briefs and arguments from both counsel. And we will take the case under advisement. Thank you. The next case and last case call for a large group of people to respond. Okay. Good afternoon. Good afternoon, counsel. My name is Brian Drew. I represent the defendant appellant, Charles H. Conkle, and the case of the people of the state of Illinois v. Charles Conkle out of Hardin County, Illinois, which was tried before the Honorable Don Foster. Initially, my first issue deals with, I'll start with a statement basically of the facts and circumstances. Mr. Conkle was charged with attempted murder, aggravated battery with a firearm in the shooting of his wife in an incident that took place in Hardin County in 2007. The parties that had a, it's a four-year rodeo. I guess is what, I wasn't real sure what it was initially, but it was exactly that rodeo of four of them, so instead of horses. So they had that all day long. The testimony was that they had each consumed, they had 230 packs of beer that started out that day and there was hardly any left. They did give some away, but the two of them didn't drink the vast majority. And that was the testimony from both sides as to what had taken place. They both consumed a tremendous amount of alcohol. When they got home, there was some sort of a discussion, an altercation. At some point in time, a gun was picked up by Mr. Conkle, and Mrs. Conkle was shot through the neck. They didn't hit any vital organs, so they're not hitting things of that sort. He immediately called 911. They came. She was treated and released shortly thereafter. It was the contention of the defendant that the gun accidentally went off, but it was not an intentional shooter. He had never had an intentional shooter that at no time did. And for some reason, in his statements to the Elmwood State Police that were given, he made the statement, that it went off and just shot, and various other types of ways of saying it was an accident, in essence. But the first argument I have deals with the fact that, on behalf of the defendant who filed the motion to continue the trial date, the defendant was incarcerated during the entirety of the time in the trial. It had to continue on more than one occasion. A couple of times, the defendant's request, I believe the state attorney had even requested a continuance at one point in time, which was all granted, with no objections at any point in time. It was ultimately set in October, and my client, while he was in custody and awaiting trial in this case, a divorce proceeding had taken place as well. Ultimately, we were attempting to hire an expert, a firearms expert, to review the gun, look at the gun, make a determination as to the fact this gun could, in fact, be fired accidentally. The state attorney's office did have experts from the Illinois State Police and their forensic unit talking about the safety mechanisms that were on the gun that was used in the shooting, and had all that evidence. It took a considerable period of time for my client's family to come up with the money as they had to hire an attorney. There was another expert, Mr. Albert Bush, who was hired also, as the scene accident reconstructionist under the circumstances, as well as, I'll get into later, additional things that I believe he was qualified to be an expert in before he was due. So, on behalf of the defendant, the motion was filed. We sought leave of the court to continue the case. It is true. Judge Foster was retiring by way of, I believe, the advance of the nation,  in office as a circuit judge. Then, as of December 1st, the state attorney did not seek re-election, and he was, as well, meeting on December 1st. That is a factual part of this case. Robert Rao, who was the incoming state attorney, as he was running on the post, he was going to be elected, was present and there because it was anticipated, even with the trial date of October, that potentially sentencing, if he were to be found guilty, would possibly have to be done with a different judge, maybe with a different state attorney. That was anticipated and thought of by the parties already, as Mr. Rao was present. Can this motion continue? It was advised of the court that Mr. Kighton in Missouri was unavailable, could not be there at the time the case was already set for trial. Asked for three weeks of a continuance for him to finalize a report, provide it to the state attorney's office, and have it go before trial. Merely contradicting things that were stated by the prosecution's expert as it relates to the weapon and the safety features. In essence, it would have still been tried while Judge Foster was still on the bench, while the state attorney was still in office. It would not have gone past that. That was Alderman's request. The alibi for Judge Foster denied the motion and said that if I wanted, I could bring Mr. Kighton there at trial and he could come tell the judge why he couldn't be there at trial. As I stand here, I don't know who has the practice. I don't know if anyone on the bench that has the opportunity to practice in front of Judge Foster, but it was an opportunity to say, well, Judge, that's by logic. I'm telling you here because I've spoken to him that my expert can't be here on the day of trial. So since he can't be here because he has to be somewhere else, I can't bring him here that day. That wasn't an option to explain that at that point in time and there wasn't an opportunity to do that. My motion was denied and we were going to trial. At this point in time, had the proposed expert, had he examined the gun? Had he formed any conclusions? He had not formed any conclusions at that time. The reason being was he could not be retained prior to that. He had and had advised me that he would be able to review the actual weapon and the reports. He had the reports, but he wanted to look at the weapon, which was the last thing he needed to do, which that was really going to require him to drive down to Hardin County to look at it. But I think he had the reports, so he'd already had basically everything that the prosecution had down that he was going to write a fine line for. And as he was talking about the safety of these people. And was any of that conveyed to the court? It was conveyed to the court. My recollection was that the court was conveyed to him that he would be able to finalize the report. He just needed to view the gun and finalize it, that he would be available three weeks later to testify and present all the evidence that the defendant needed at that point. The court denied that, and the case then proceeded to trial. I will assert that, happily or perhaps at stake, that the issue was not brought back up at trial concerning this expert. The motion was denied at that point. There wasn't a law for approval. It was a simple fact that, at that point in time, the financial status of paying, at that point in time for the expert to finalize the report, which was several thousand dollars, to complete one that was going to be done. At this point, useless because it could not be done at the date of trial. My expert already stated that he couldn't have it done by the date of trial. It wouldn't be available as of the date of that trial. So at that point in time, it seemed superfluous to go ahead and have him complete a report after the fact at the trial at that point in time. It did not happen. We would ask the court to overturn the conviction, stating that that motion would be re-evaluated for just three weeks. It was not prejudicial to any. It wasn't prejudicial to prosecution. It was prejudicial to the court and the court's docket at that point in time. It had not been in the urgency of prosecution to try the case at any point in time. Three weeks still allowed it to be tried because it only took five days to try. No one anticipated it would take much longer than that. It was going to be tried still within the court's term on the bench as well as the state's term. So the only person who was prejudiced was no one else at that point in time. And the crux of the whole case was determined. Could this gun be shot accidentally or not? I mean, at the end of the day, it was irrefutable that they had an argument, that the gun was pulled out, that it was there. Really, what the crux of the case came down to was, could it be an accident? And that was what I believe our expert, in his initial, I think, review of documentation, ultimately, that's what the testimony would have been. That is part of the record, though. Is there anything in the record that shows that the expert would have contradicted the case experts? There was nothing ever ultimately part of the record. So I can't assert that as part of the record. What I can say is that the defense motion continued while, I believe, timely under the circumstances. And certainly no one prejudiced what the gun was, in fact. The second argument deals with the motion to suppress. The standard there being looked at as manifestly erroneous, and the denial of the motion to suppress. And in that, my client, there were statements made that he had drank a tremendous amount of alcohol on the day in question. The Illinois State Police brought him in. It was also unrefuted that my client had an inability to read and or write the U.S. language. He was brought into an interrogation room, and the Illinois State Police read him with Miranda warnings. And then he proceeded to give a statement that he was unable to write on that and to write it down. But she said he could not. And then the officer himself stated that he wrote down, and in his testimony, the motion to suppress, that he wrote it down word for word and then said, is this what you said? Well, my client didn't take it for a reading or writing. That time was placed before him at that point in time. He asked for a breathalyzer at one point in time, approximately 1 a.m., several hours after the incident, I believe. A while after he was taken into custody, approximately over an hour. He still had a .101 blood alcohol content at that point in time, and he had not been drinking at that point for several hours at that point in time. We would ask the court to overturn the court's finding that his waiver of his Miranda warnings and his statements to the police at that point in time were proper and knowing under circumstances. The third argument, and I will really place this together with another argument later being the fifth argument, and I'll argue them together with the court, is they really are intertwined, and that is in relation to the expert of the defendant being Albert Bush. Albert Bush worked with MSA police for 20-plus years. He had gone out into private practice as an investigator as well as in various other offices that he held in certain islands. In working with MSA police, he testified before the court that he had on a number of occasions, on multiples of, I believe, over 500 times. He had, in fact, viewed crime scenes, the evidence that was contained therein. In addition to that, he had worked very closely with pathologists and other individuals in bullet wounds and their death. He had read specifically the one treatise that I was citing, and based on laying the foundation in my mind to be admitted as an expert while not possessing the actual degree to make him an expert in wounds or in how a wound can happen and the trajectory of a bullet entry into a wound. He had, by practical experience, done that, which is what I was attempting to do to place before the court his experience in showing the court that. He talked about a treatise, a book, and Mr. Bush was testifying that he had actually worked with the son and the author of the book and spent a considerable period of time viewing those wounds that are talked about in the treatise that is commonly used in that area of determining the angle of bullet wounds and things of that sort, at which point the court, without any objection by the prosecution or anyone else, stated that, I'll paraphrase it slightly here, in the brief that that's all very good, Mr. Drew, that's very nice, but irrelevant here, without any objection by the prosecution, without any statement on my behalf to the court or anything else. Then at that point in time when I proceeded to ask the court to admit him as an expert, the court, it gets a little buggy as to what he did and didn't do. I asked him by way of an active reconstructionist to be admitted as an expert, and in addition, also in the area of the wound itself and the entry of a bullet and things of that sort. And the court said he was admitted as an expert to some extent, but not others, but he can go ahead and testify. And the way he was done was beyond that. To the day I'm not sure whether he was qualified in as an expert before the court. The court just said, well, he can go ahead and testify, and basically the state didn't make any more objections after that. So he proceeded to testify on a whole number of items. Did he testify, or was he asked about the ability of this particular weapon to be fired accidentally in the circumstances that were outlined by the testimony? Well, Mr. Bush, although he wasn't an expert in weapons, I think he did, I don't believe he talked any great length at all about the safety items on the weapon. He knew about them. I got some of that out through the prosecution's expert of what safety items were on a gun, what there could be, what there was, what wasn't on this particular weapon, but not anything of any great detail. Mainly, there was contention by the victim that she was on her knees. That didn't seem like what her hand does, acting him out to shoot her. And in essence, Mr. Bush was there testifying that by the angle of the wound, the burn pattern of the entry of the bullet itself, as well as the view of the room, the bullet was never found. It was through and through her neck, and it was never actually found in the home anywhere. So the determination that he came in to testify that she could not have been on her knees whenever he fired, when the weapon was actually fired, and that was the biggest part of his testimony of what he was there about. And part of that was a requirement to have knowledge and an understanding of wound injuries and bullet and burn patterns on wounds as it enters into the skin of the body, so he could determine what angles those were. That was, in essence, what Mr. Bush was there about. After I had attempted to put Mr. Bush forward as an expert in a number of different fields, and he had a tremendous amount of expertise and experience in it, after the court stated, well, that's very nice, Mr. Drew, but that's irrelevant here, the court then actually physically turned his chair away from facing forward, turned it toward the witness, which he did not do in any of the prosecution's witnesses, and proceeded to, every time if any objection was made or Mr. Bush said, you know, I'm not sure what you're saying, counsel, the court would, his face was red, his hands went up. It was the body language of what it was, and I excite and agree that he had body language. You can't see it on the record, but, I mean, he was turned toward it, and you can see in there some of the statements of just answer the question. It's a simple question. Why don't you just go ahead and answer the question? This isn't hard. And the court proceeded to berate Mr. Bush for basically all his testimony periodically, would make statements, and when you tie that together with the court's animosity that originated in his statement to myself on behalf of my expert, and then in addition his continuing of doing that throughout, his refusal to allow him to come in as an expert in all of the fields, or at least allow him to lay a foundation as to what it was, which I attempted to do more than once and asked the court to do. In essence, he eviscerated my expert. I mean, I have an expert here. It got to the point where even the prosecution at the end goes, this guy wasn't even qualified to be an expert here in testifying today, because he could say that by the time the court got done with my expert, when he was, I believe, infinitely qualified. I mean, his curriculum details there, his expertise in all that he had done. For some reason, the court was very antagonistic towards my expert, and in essence, I believe, removed the ability of my client to have a fair trial under the circumstances, whenever you put all of that together under the circumstances. In addition, we had an argument in there about two things. One, that there was insufficient evidence presented by the prosecution to prove my client guilty beyond a reasonable doubt, ultimately was found not guilty of attempted murder, but he was found guilty of aggravated battery with a firearm. And under the circumstances, we argued that there was not sufficient evidence presented by the prosecution to show that there was any intentional acts on behalf of my client, voluntary intoxication not being a valid offense, you didn't have the requisite legal state to do it. I mean, there was factual evidence that was presented concerning her alleged statement of what happened here, that it would happen. She came in the door, he was chasing her, and he immediately shot her. I was directly refuted, because she had on a hat and shoes, but ultimately in pictures of the home, it was in the exact status of the night of the shooting, there were the tennis shoes that she had on, neatly sitting there, the hat that she had on, placed on there. There were clothes piled up which she said she was leaving, which is what actually brought about the argument between the parties concerning that. And in addition to that, the expert testimony from Cleaver refuted her allegations of being on her knees and begging for her life at the time when the gun actually went off. So I believe there was insufficient evidence under the circumstances to prove him guilty. Finally, and I'll be very brief on this, we believe my client's sentence to 15 years in the Illinois Department of Corrections was in fact an abuse of discretion, and we have cited the case law there and the facts and the circumstances under that, and I won't go into that, other than to the extent that I think the court's overall demeanor in the actual prosecution of this case, of trying this case, I think both placed him in a position where my client's sentence was far harsher than I think what he might be otherwise, although his sentence was in the middle range of what he potentially could have been sentenced to. So for all those reasons, we would ask that specifically, for the denial mostly contingent of the actual conviction, my client be overturned and caused to remain in a further trial. Only alternative to that, in fact, the denial of accepting the expert, and the statements of the court toward that expert basically denied my client a further trial, and we'd ask that he remain in this trial. Thank you. Thank you, Counsel. This case has been set for trial three previous times, twice continued on defense motion, once continued because the defense has filed a motion to suppress statements, which was filed after the time for filing pretrial motions. So the case is set for trial on October 27th. On October 20th, the defense counsel comes into court and says he wants to continue that case for the presence of John C. Clayton, allegedly a firearms expert. Now, at that point, Clayton's name had never been furnished to the prosecution in discovery. The prosecution had not received any description of Mr. Clayton's qualifications. There were no reports of Mr. Clayton furnished to the prosecution or the court, and there couldn't be because John Clayton had never examined the evidence in the case. Now, and to this day, he hasn't examined the evidence in the case. I mean, perhaps we can assume that because he was a hired gun, his testimony would have been useful to the defendant, but that would be unduly cynical. If he was an honest man, he would have agreed with the testimony of firearms examiner James Hall, that it required an 11-pound trigger pull to fire the gun in the double-action mode, that is, if he didn't cock the trigger, and four pounds if he did cock the trigger, because those are absolutely typical figures for an ordinary revolver. Indeed, I expect there are people in the Hardin County jury who knew them without hearing from any expert. But the Senate wanted to continue the case to 13 days before the expiration of the judge's term and the state's attorney's term. Now, four of those days have to be knocked out as weekend days, and two have to be knocked out because of the Thanksgiving holiday. So he wanted to continue the case to when there were seven trial days available before the end of the judge's term. Now, as it turned out, this case was tried in, I guess, less than that, five trial days or something of that nature. But nobody knew that was the case. That would necessarily be the case. I mean, things happen during trials. The continuance requested by the defendant carried considerable potential for the judge suddenly stopping to be a judge in the middle of the trial and the state's attorney suddenly stopping to be a state's attorney. I mean, of course, continuance is discretionary, but it seems to me that the factors here against the continuance were overwhelming. Three previous continuances caused by the defense. An alleged expert whose name has never been furnished in discovery to the prosecution at the time the motion for continuance was made. He was finally listed as a witness two days after the motion for continuance, but even then there was no description of what his testimony would be. An alleged expert who had no reports furnished to the other side and who couldn't form an opinion because he hadn't yet examined the evidence. And they requested continued data, which might not have been feasible because, of course, the state's attorney having no notice of this motion for continuance before the data was made had no idea whether his witnesses, many of whom were experts from outside of Hardin County, or some of whom were experts from outside of Hardin County, would be available. And they requested continued data. And finally, a continued data is really no free will the judge would want to set because of the potential for the term of office of both the judge and the state's attorney expiring right in the middle of trial. I mean, all those factors indicate that the judge did not use his discretion. But even if you question the judge's decision under Illinois law, you don't have a basis for overturning it because you have no idea of what Mr. Clayton was going to testify to. As I say, in my opinion, if it was an honest man, he would have agreed with Mr. Hall. But we don't know. Mr. Clayton doesn't know. He never saw the guy. The alleged financial stringency, which caused the absence of any indication of what Mr. Clayton might have testified to, was never advanced to the trial court as a reason. And finally, on that issue, the judge didn't really deny the motion for continuous. What he said was, you bring in Mr. Clayton to explain why he can't be here on the trial date because the record contains no explanation. I mean, was Clayton planning on a vacation to Florida? Was he under subpoena in some other case? Did he just feel he wanted more time to consider it? We don't know. And so the judge wanted to know, and he said, he didn't say bring Clayton in on the trial date. He said, bring Clayton into the court to explain why he can't be present during the trial. After all, there were, as I said, seven court days available for trial. He suggested continued date, and there was no reason advanced why Clayton couldn't be available in any of them. We don't know what Clayton would have said. We don't know why Clayton was supposedly unavailable. There's no basis for overturning his ruling on the continuous. Now, while the motion is suppressed, there were three witnesses who testified on that, not including defendant. In fact, not including any witness associated with the defense. There was one deputy sheriff and two Illinois state troopers. Now, all of them said that this defendant was clear and perhaps understood every question put to him, insisted on his rights when he wanted to. That is, when he agreed to consent to a search only if he could be present during the search. And the statement that the two Illinois state police sergeants was actually recorded on a CD which was admitted as evidence heard by the jury. That is not part of the record on appeal. The judge listened to it before ruling on the motion to suppress. So all the evidence in the record indicates that this man was clear and coherent and understood every question that was put to him in his statement. And the judge presumably agreed with that after listening to the very words of the defendant in the statement that mattered. There's no basis for overturning that decision, because this court cannot listen to that hour-plus long statement because it doesn't have the CD with the trial judge in it and the jury in it. So all the evidence indicates someone who understood his rights, understood what he was doing, understood the questions, made a voluntary statement. All the evidence in the record, and probably all the evidence that isn't in the record since the prosecution offered the CD of the oral statement to the state police sergeants, both of the motion to suppress and the trial. Now, the only evidence of intoxication is that immediately after the statement to the state police sergeants, this defendant, at his own suggestion, underwent a breathalyzer test and blew 0.101. Now, that's over the legal limit for driving, 0.8, but it's not a level which makes a person incapable of understanding or talking. His reaction time is probably slow, but as admittedly a very experienced drinker, he probably, well, probably, I would say, as the evidence shows, that he was still able to understand enough to answer all the questions put to him and to understand the Miranda warnings. I've cited cases in my brief indicating that intoxication is far more extreme than that. It's not sufficient to show a statement to be involuntary. Now, on the question of the expertise of the defense expert, Albert Bush, the jury knew everything about Albert Bush's life-threatening experience because he testified to it. The jury heard every opinion and conclusion of Albert Bush that the defense cared to offer. There were no objections to his opinions and conclusions. And there were no objections sustained, of course, to those non-existent notes. Since there were no objections, there were none sustained. Everything that the defense wanted Albert Bush to say, he said. The court ruled that Albert Bush was an expert, but the only specific ruling as to expertise by the trial judge was that he wasn't an expert in forensic pathology. Now, this court knows that to be an expert in forensic pathology, you have to have an MD degree and special instruction and experience in autopsies, or at least the analysis of disease and wounds. Albert Bush had no medical training at all. And while he had observed autopsies, he certainly never performed one and never been responsible for reaching conclusions about a cause of death or anything related to it. So I would say the ruling that Albert Bush was not an expert in forensic pathology was entirely the right one. But what matters is what the jury heard. The jury heard everything this court has heard and more about Albert Bush's background as a crime scene investigator for the state police. So the jury knew what his expertise was and what it wasn't. And the jury heard every opinion and conclusion of Albert Bush that the defense asked him to make, because the people didn't object and the judge let it, and the judge, of course, let it in. Now, with respect to the comments of the trial judge, it must be remembered that when Albert Bush testified as to his expertise, it was a contentious matter at that point. It wasn't just a matter for the jury. The judge had to decide whether Albert Bush was an expert. Everyone agreed that he was an expert on crime scene investigation, but whether he had expertise in other fields. And so when the judge told the defense counsel that something wasn't relevant, that was entirely appropriate, because it was an issue in which the judge had to decide, and the judge had to determine what was relevant. And the specific thing that the judge said wasn't relevant was that Albert Bush had once read a book by an expert in forensic pathology and had worked on a case with that expert's son, which hardly established himself because he was an expert in forensic pathology. If reading a book on forensic pathology makes someone an expert, then I'm an expert. I'll go around charging $100 an hour for my testimony, because I've read a number of books on forensic pathology, but I would never pretend to be an expert in that field. Now, Albert Bush, as I said, the jury heard everything that the defense wanted them to hear from him. But he proved to be a remarkably evasive or, shall we say, unforthcoming witness on cross-examination. He was asked a number of very simple questions related directly to what he testified to on direct examination, but simply refused to answer them or evaded them. And the judge told him on several different occasions to answer the questions. If you would read the transcript, you will see there's a clear pattern of a witness who testified clearly on the subject on direct examination, simply refusing to answer questions on cross-examination. And the judge, if he's going to run the court and have a fair trial, has a duty to admonish a witness to answer a question when the witness refuses to do so. So the rulings of the judge in this case were entirely understandable in each case. And I would suggest didn't prejudice any legitimate interest of the defendant. The defendant didn't have any inherent right to add a new expert to a case a week before trial after three continuances, especially when the witness had never been named in discovery, never filed a report, never examined the evidence. All the evidence of the motion to suppress indicated that this witness was confident to waive his Miranda rights and answer questions. The defense expert was allowed to testify to everything that the defense wanted to question him about. And the judge, in his comments, simply told the defense counsel what was relevant to establishing someone's expertise in the field of forensic pathology and admonish the witness to answer the question, all of which would be proper if the judge is to be something more than an idol at the top of the bench and is actually going to move the case to a conclusion. So for these reasons, we ask that the conviction be affirmed. Thank you, counsel. Counsel? As the ruling continues, take except for October 20th as your three-week continuance, I propose which would have been well within the court's discretion to say, we're not going that long. He can't be able to reach the 23th, the 27th. We're going to start it on this day. We'll roll over until a week when he can be here. He can either be here or he can't be here. But I didn't get it. There wasn't any of those options today before the defendant at that point in time. It was simply a no. And your expert could come here during the week of trial when the court was already advised he couldn't be there. But if he came there, he could explain to him why he couldn't be there. What was alleged as to why he couldn't be there? I believe it was just his work schedule. He was on leave. I don't think it's clear on the record exactly what that was. And really, to be honest, I don't think the court was asking to ascertain why he couldn't be there. Because he didn't say, bring him here tomorrow, or we'll continue this for a day or a day after. It was bringing him back in the week of trial and said he couldn't be here. And he can tell this court here while the trial is going on why he couldn't be there. At the time he was already told he couldn't be there. So I don't think that was ever the intention of the court. This was before an opportunity for the defendant's expert to come and explain why he wasn't going to be there. And as it relates to Mr. Bush, I think part of the key is in exactly what he was qualified in. The judge said, well, I'm allowing him as an expert as an accident reconstructionist, but not anything to do with ballistics, blood splatter, or anything else. I'm not allowing him anything as an expert as it relates to any of that. And yet, he had testimony out of Bush that not just that he read a book one time and did one case. That was a specific example, that he had done over 500 murder and other investigations for the Illinois State Police over a 20-plus year career of analyzing crime scenes, of analyzing evidence, of analyzing wounds. He had seen over 500 wounds and had analyzed them as it relates to their entry, as it relates to bullets, and knife wounds, various other things he had done, and had some layperson expertise in that area. We weren't asking him to be a criminal pathologist to say why someone died. Merely to come in and testify as an expert as to path injuries of wounds based on this accident reconstruction and crime scene investigation that he did. The court was specific to say, only the collection of evidence is what he's an expert in. Well, he can be an expert in the collection of evidence. I mean, I'm not sure what benefit that had to defense at all. And yet, the court was very specific about it. And then when you tie that together with the court's, I believe, antagonistic attitude towards Mr. Bush repeatedly throughout the case, it's unsolicited statements to myself while questioning Mr. Bush. And I've been before many courts before, where I'm attempting to lay a foundation in the court system. You need to move all counsel over. Can you approach in a jury trial, can you approach, you know, this area isn't doing any good. You need to get me somewhere we can get. But it wasn't the case. It was unsolicited from the bench, in front of the jury, and then proceeded on with everything else. And the problem is, to take one specific incident of the court out of the context of which it was in and say, well, look, this didn't do it. And then grab a different single incident and say, well, look, this didn't prejudice the defendant. But it wasn't that. The totality in the trial of his antagonistic attitude towards Mr. Bush, his expert opinion, I think, severely prejudiced the defendant. Because it did so much so that the prosecution himself was very happy to say in his closing that this court refuses to accept Mr. Bush as an expert. And he's not going to. And he enjoys saying it. Because it does have an effect. And it has a prejudicial effect on the defendant. We would ask that this be overturned. Thank you. Thank you, Your Honor. We appreciate the briefs and arguments from counsel. The case is under advisory of the court's appearance.